**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

**CASE NO.  8:16-cv-03255-EAK-MAP**


SLADJANA PERISIC, on behalf of
herself and others similarly situated,

     Plaintiff,

vs.

ASHLEY FURNITURE INDUSTRIES, INC.,
a Wisconsin corporation,

     Defendant.

_____/


<u>**OBJECTIONS TO REPORT AND RECOMMENDATION**</u>
<u>**TO DENY MOTION FOR CLASS CERTIFICATION**</u>

Pursuant to Local Rule 6.02, Plaintiff respectfully submits the following objections to the Report and Recommendation of United States Magistrate Judge Mark A. Pizzo, filed on June 27, 2018 ("R&R"), Dkt. 99:

**OBJECTIONS**

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| 1. | Considered a synthetic leather in the industry, [DuraBlend is] comprised mostly of polyurethane, some poly cotton, and a small amount of pulverized or ground-up leather. No discerning purchaser would be deceived about all this because AFI affixes a decking label to each upholstered piece explaining as much. | 1 |
|    | *Objection:* The court here makes an improper merits determination by ruling that "no discerning purchaser would be deceived." The issue concerning the merits at the certification stage is limited to whether the merits may properly be adjudicated within the framework of a class action. *See Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*, 458 Fed.Appx. 793, 794 (11th Cir. 2012) ("district court may not resolve the merits of a case when ruling on Rule 23 motion"). |  |
|    | While the Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) encouraged lower courts to look at the merits in deciding a certification motion, it later cautioned against a "free-ranging merits inquiries at the certification stage," stating that the merits "may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Retirement* |  |

1

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | *Plans and Trust Funds*, 568 U.S. 455, 466 (2013); *see generally* Consideration of the Merits at Class Certification, 3 Newberg on Class Actions § 7:23 (5th ed.). | |
| |     Even if the court were permitted to resolve merits questions at the certification stage, the court here applied the wrong standard. The standard of liability under FDUTPA is not whether a "discerning purchaser" would be deceived but whether the representations alleged to have been made to the class were "likely to deceive a consumer acting reasonably under the same circumstances." *Gold Coast Racing, Inc. v. The Home Depot U.S.A., Inc.*, 2006 WL 4579688, *2 (S.D. Fla.). This is an objective standard that does not inquire into the state of mind of individual class members or of the named plaintiff. *Carriuolo v. General Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016). | |
| |     Whether the plaintiff or anyone else in the class relied on defendant's allegedly deceptive representations is thus irrelevant. Instead, the factfinder in the instant case must only determine whether furniture that has the appearance of leather and is represented—whether via hangtags, decking labels, print ads, or the spoken word—as containing "leather" and being "durable" would "deceive an objectively reasonable observer" (*Carriuolo, supra,* at 986) into believing that the furniture "consisted of leather and was of similar quality, strength, or durability as leather." (Complaint, ¶¶ 10-11.) | |

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|

Plaintiff has presented extensive evidence that using the word "leather" to market and sell products that have the appearance of leather but are not leather carries with it the likelihood that consumers will be deceived:

- AFI itself was concerned before launching DuraBlend in 2008, and discussed internally, that using "leather" to name and market a PU fabric could mislead consumers.

  (*See* Ross Depo at 27:12-28:6, 114:18-116:5, 118:12-119:9, 120:9-20, 166:12-17); *see* Exh. H [Email], Exh. I [Email], Exh. J [Email], Exh. K [Email], Exh. L [Email], Exh. M [Furniture Today Article], Exh. N [Email], Exh. O [Email], Exh. P [Email], Exh. Q [Email], Exh. R [Email], Exh. S [Wanek Decl.], Exh. T [Beneski Decl.]); Lebensburger Depo at 51:7-17, 52:14-59:7, 168:7-169:23, 197:2-198:10.)

- Experts and industry commentators expressed grave concerns about using "leather" to market the new fabric. (*See* comments of Susan Andrews and Dr. Nicholas Cory, quoted in litigation related to ad campaign about the deception issue.

  (*See Design Resources, Inc. v. Leather Ind. of America*, 789 F.3d 495, 498-499 (4th Cir. 2015) [affirming summary judgment for all defendants], citations to record omitted; *see also Design Resources, Inc. v. Leather Ind. of America*, 2014 WL 4159991, *7 (M.D.N.C.) [rejecting plaintiff's claim that Andrews' and Cory's statements were false or misleading].)

- AFI dropped the phrase "Blended Leather" from the DuraBlend logo in the middle of 2013 over concerns that it was misleading.

  (*See* Lebensburger Depo at 168:19-169:15.)

- Pronouncement of the Federal Trade Commission: "It is unfair or deceptive to misrepresent, directly or by implication, the composition of any industry product or part thereof. It is unfair or deceptive to use the unqualified term "leather" or other unqualified terms suggestive of leather to describe industry products unless the industry product so described is composed in all substantial parts of leather."

  (16 C.F.R. § 24.2 [preamble].)

| No. | MATTER OBJECTED TO | Page |
|-----|-------------------|------|
| | • Historical cases involving deception in the sale of products designed to imitate leather; for example: <br><br>*R. Neumann & Co., v. Overhead Shipments, Inc.*, 326 F.2d 786, 789 (C.C.P.A.1964) ("DURA-HYDE," when applied to a plastic material of leather-like appearance, was deceptive as connoting "durable leather"). <br><br>*R. Neumann & Co. v. Bon-Ton Auto Upholstery, Inc.*, 326 F.2d 799, 801 (C.C.P.A.1964) ("VYNAHYDE," as applied to artificial leather deemed deceptive because it suggests real leather). <br><br>*Masland Duraleather Co. v. Federal Trade Commission* (3rd Cir. 1929) 34 F.2d 733, 736-738 ("Duraleather," when applied to imitation leather has tendency to deceive ultimate purchasers). | |
| 2. | And while the fabric may resemble leather to some consumers (to others it might not), its attractive cost will not confuse anyone who has priced a comparable piece of leather furniture. | 1 |
| | *Objection:* The court here improperly rules that the fabric's "attractive cost will not confuse anyone who has priced a comparable piece of leather furniture." Not only is this an improper merits determination (see discussion, *supra*), the record contains no evidence regarding the cost of leather furniture or whether a reasonable consumer would have "priced a comparable piece of leather furniture" before making a decision to purchase a piece of furniture upholstered with DuraBlend. In other words, even if the court's ruling on whether the fabric's "attractive cost [would] confuse anyone who [had] priced a comparable piece of leather furniture" | |

| No. | MATTER OBJECTED TO | Page |
|-----|-------------------|------|

were proper (and relevant), the record does not contain any evidence upon which to make that ruling.

Moreover, the court's finding that the "attractive" price of DuraBlend "will not confuse anyone who has priced a comparable piece of leather furniture" is also irrelevant. While the record contains evidence that Plaintiff understood she paid "something less" than she would have paid for furniture upholstered with 100 percent leather (Perisic Depo at 66:8-11), she has never alleged that she or anyone else was misled into believing that DuraBlend was *100 percent* leather. Rather, she alleges that AFI's representations concerning DuraBlend, including the fact that it looks like leather, misled her and the other members of the class into believing that it "consisted of leather and was of similar quality, strength, or durability as leather." (Complaint, ¶¶ 10-11; Perisic Depo at 57:19-24.)

Finally, the record contains no evidence of whether a reasonable consumer would have found the cost of DuraBlend "attractive," as the court suggests. The record does, however, contain some evidence that AFI directed its marketing of DuraBlend to a lower-income segment of the market (MacLean Report at 4: "it is likely that each material [DuraBlend and leather] serves a different segment of the furniture market and different price point"), from which one might infer a lesser degree of knowledge about leather prices and a lower likelihood that the reasonable consumer would consider DuraBlend prices "attractive" and that they therefore would conclude that DuraBlend could not contain leather, despite AFI's

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | claims to the contrary. *See Lavie v. Procter & Gamble Co.*, 105 Cal.App.4th 496, 506 (2003) ("truthfulness [of advertising] must be measured by the impact it will likely have on members of that group, not others to whom it was not primarily directed"). | |
| 3. | Almost five years ago, the Plaintiff, Sladjana Perisic, purchased a DuraBlend® covered sofa, love seat, and recliner at bargains that she could never have confused with like leather items. She claims AFI's sales representative somehow misled her to believe that the fabric would wear as well as leather nonetheless. | 1 |
| | *Objection:* The court's ruling that Plaintiff purchased her DuraBlend furniture at such "bargains that she could never have confused [it] with like leather items," improperly resolves the central merits question of whether a reasonable consumer likely would have been deceived by AFI's representations concerning DuraBlend. Not only does the court fail to leave this merits question to a future trier of fact and simply determine whether the question can be answered by common proof, the court resolves this merits question without evidence in the record of Plaintiff's or a reasonable consumer's knowledge of leather prices. <br><br> Moreover, as above, the court's finding that Plaintiff "could never have confused [DuraBlend] with like leather items" is irrelevant to the liability determination. While Plaintiff knew she paid "something less" than she would have paid for furniture upholstered with 100 percent leather (Perisic Depo at 66:8-11), she | |

| No. | MATTER OBJECTED TO | Page |
|-----|-------------------|------|
| | has never alleged that she confused DuraBlend with 100 percent leather. Rather, she alleges that AFI's representations concerning DuraBlend, including the fact that it looks like leather, misled her and the other members of the class into believing that it "consisted of leather and was of similar quality, strength, or durability as leather." (Complaint, ¶¶ 10-11; Perisic Depo at 57:19-24.)<br><br>The court also appears to question Plaintiff's assertion that her belief that the furniture "was of similar quality, strength, or durability as leather" was in part based on the salesperson's statements. Plaintiff testified in her deposition that her belief was based both on the fact that the furniture looked like leather and on the salesperson's representation that the upholstery was leather mixed with synthetic materials. (Perisic Depo at 30:6-30:8, 31:20-32:15, 57:11-25, 95:18-23, 122:8-9.) Their conversation about the durability of the furniture and the salesperson's experience with the same furniture contributed to Plaintiff's belief. (Perisic Depo at 56:14-58:13.) The salesperson told Plaintiff she had Ashley furniture, although Plaintiff does not recall whether she specified she had the same model Plaintiff was looking at. Because they were talking about the durability of the furniture Plaintiff was thinking of buying, however, Plaintiff reasonably assumed the salesperson was talking about the same furniture. (Perisic Depo at 56:14-57:10.)<br><br>The record contains no evidence contradicting Plaintiff's account of her experience at the Ashley store. | |

| No. | MATTER OBJECTED TO | Page |
|:---:|:---|:---:|
| |   With respect to the actual prices that the court found to be such "bargains that [Plaintiff] could never have confused [them] with [the prices of] like leather items," the court's finding that they were $217 for the loveseat, $239 for the sofa, and $360 for the recliner (R&R at 3) is erroneous, for the following reason. To acquire her DuraBlend furniture, even at the discounted prices referenced in her invoice, Plaintiff had to pay $1,355.98, the total discounted price charged for the entire collection (not counting the delivery or the protection plan). The alternative would have been for her to pay the list price just for the DuraBlend pieces, which would have totaled $1,379.97 ($499.99 for the sofa, $479.99 for the loveseat, and $399.99 for the recliner). The conclusion, therefore, that she only paid $813.13 for her DuraBlend furniture ($239.56 for the sofa, $217.58 for the loveseat, and $355.99 for the recliner) is incorrect, given that she had to buy the entire collection (for $1,355.98) to get the DuraBlend pieces at the discounted prices. (*See* Hook Depo II at 89:12-23, 90:19-22, 94:1-18, 95:1-10, and Exh. 8 to Hook Depo II [Plaintiff's Invoice].) | |
| 4. | AFI says it abides by the FTC's promulgations. It discloses that DuraBlend® "is not leather," or it discloses "the percentage of leather fibers and the percentage of non-leather substances contained in the material" in a number of ways to the public. Doc. 48-2, ex. M (Ross Declar.), sub-ex.10 at 34629 (Guidelines for Select Leather and Imitation Leather Products, 16 C.F.R. Part 24). | 2 |

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | *Objection:* The court's finding that AFI discloses that DuraBlend "is not leather" (as required by 16 C.F.R. § 24.2(a)) is incorrect. So is the court's finding that AFI discloses "the percentage of leather fibers and the percentage of non-leather substances contained in the material" (as required by 16 C.F.R. § 24.2(f)(2)). | |

The FTC regulation in question, 16 C.F.R. § 24.2, provides in pertinent part as follows:

> [16 C.F.R. § 24.2(f)(2)] Imitation of simulated leather. If all or part of an industry product is made of non-leather material that appears to be leather, the fact that the material is not leather, or the general nature of the material as something other than leather, should be disclosed. For example: Not leather; Imitation leather; Simulated leather; Vinyl; Vinyl coated fabric; or Plastic.

> [16 C.F.R. § 24.2(f)(2)] A material [that] contains ground, pulverized, shredded, reconstituted, or bonded leather and thus is not wholly the hide of an animal should not be represented, directly or by implication, as being leather. [I]f the material appears to be leather [and if] the terms 'ground leather,' 'pulverized leather,' 'shredded leather,' 'reconstituted leather,' or 'bonded leather' are used, a disclosure of the percentage of leather ***fibers*** and the percentage of non-leather substances contained in the material [must be used]. For example: … Bonded Leather Containing 60% Leather Fibers and 40% Non-Leather Substances. (Italics added.)

Consistent with the FTC regulation, AFI agrees that leather is the *hide of an animal* and very different from DuraBlend, which is simply a polyurethane (PU) fabric with pulverized leather sprayed on the back. (*See* Adams Depo at 102:8-21, 108:8-109:4, 109:5-15, 117:8-118:6; Lebensburger Depo at 169:11-12;

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|

Ross Depo at 20:6-15, 49:3-25, 55:8-61:15, 64:10-65:8, 66:17-20, 70:12-22, 74:19-76:2.)

Also consistent with the FTC regulation, ASTM standard D1517 (setting forth the industry standard definition of "leather") provides that no product should be described as "leather" if it consists of leather broken down into powder or other fragments:

> [Leather is] a general term for hide or skin that still retains its original fibrous structure more or less intact. … No product may be described as leather if its manufacture involves breaking down the original skin structure into fibers, powder or other fragments by chemical or mechanical methods, or both, and reconstituting these fragments into sheets or other forms.

(See Exhs. MM, NN, OO to Opp. to Mtn to Strike.)

Even though AFI attempts to hide behind the FTC regulation cited above, it has never followed it, instead using the following misleading statements:

- 2008 & 2013 Hangtag: "CONTAINS 17% LEATHER"

  (*See* Adams Decl., ¶¶ 13-14.)

- 2016 Hangtag: "CONTAINS A MINIMUM OF 17% LEATHER"

  (*See* Adams Decl., ¶ 11.)

- Decking label: "CONTAINS 17% LEATHER"

  (*See* Adams Decl., ¶ 11.)

- Print ads: "Contains 17% Leather"

  (*See* Hook Decl., ¶ 13, and Exhs. 4-9 to Hook Decl. [Print Ads].)

- Website: "Fabric Contents: … 17% leather"

  (*See* Hook Decl., ¶ 15.)

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | In other words, everywhere that it claims to provide a "disclosure" of the contents of DuraBlend, AFI falsely represents that it contains "leather," without qualification or explanation that the referenced "leather" is in fact not *leather* under FTC regulations or industry definitions. Rather than follow it, AFI simply restates a variation of the regulation in its usual disclosure, cleverly building in a negative pregnant designed to mislead consumers into believing the upholstery in fact consists of leather (even if not 100%) and therefore has the characteristics of leather:<br><br>DURABLEND IS A MATERIAL THAT CONTAINS GROUND, PULVERIZED, SHREDDED, RECONSTITUTED OR BONDED LEATHER AND IS NOT ***WHOLLY*** THE HIDE OF AN ANIMAL AND SHOULD NOT BE REPRESENTED AS BEING ***100%*** LEATHER<br><br>(*See* Hangtags [2008, 2013, and 2016]; Decking Label; italics added.)<br><br>In other words, even if a trier of fact were to conclude that a reasonable consumer would have read the disclosure language on AFI's tags and labels in its entirety (even the fine print), the trier of fact would still conclude that the reasonable consumer likely would be deceived given the deceptive and false nature of the "disclosure." | |
| 5. | No one remembers now whether these DuraBlend® pieces had hangtags or not. If they did, all undoubtedly said the piece was "Durable." But the use of that term begs the question: Durable as compared to what? | 3 |

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | *Objection:* Plaintiff alleges that AFI's representations concerning DuraBlend, including the fact that it looks like leather, misled her and the other members of the class into believing it "consisted of leather and was of similar quality, strength, or durability *as leather*." (Complaint, ¶¶ 10-11, emphasis added; *see also* Hearing Transcript at 5.) As Plaintiff has explained in connection with her proposed method of calculating classwide damages, Plaintiff alleges that AFI engaged in a practice of marketing furniture that has the appearance of leather in a manner that would deceive a reasonable consumer into believing the furniture has the durability of the "leather" furniture it is being held out to be. Plaintiff has in detail laid out the evidence that establishes AFI's ongoing and deceptive practice to market and sell DuraBlend, a product purposely designed to imitate the appearance of leather, by using words such as "leather" and "durable" and other phrases associated with leather. The evidence establishes that not only did AFI communicate such imagery directly to consumers through hangtags and decking labels attached to the furniture, it also created carefully drafted "training" materials that it distributed throughout its retail network to ensure that the DuraBlend furniture would be presented to consumers for maximum effect.<br><br>Plaintiff's evidence further shows that she herself fell victim to this practice and suffered monetary harm as a result. Under FDUTPA, she need not establish that she relied on the representations of the Ashley salesperson or the | |

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|

representation made directly to her by AFI through the leather-like apperance of the DuraBlend fabric. To prove her claim, she need only show that she purchased furniture that a reasonable consumer would have believed "consisted of leather and was of similar quality, strength, or durability as leather"; that that belief was erroneous; and that (to show causation and damages) the value of the furniture delivered was lower than the value of the furniture as represented (meaning, it was selling at price premium):

> In *Collins v. DaimlerChrysler Corp.*, 894 So.2d 988, 991 (Fla.Dist.Ct. App. 2004), a Florida appellate court held that a plaintiff adequately alleged actual damages under FDUTPA when she purchased a vehicle with defective seatbelts. Chrysler argued that the plaintiff did not suffer any out-of-pocket damages because the seatbelt never malfunctioned during an accident. *Id*. at 989. The court, however, recognized that this was the wrong metric. *Id*. at 990-91. Because FDUTPA allows for damages based on diminution of market value, the court permitted the plaintiff to proceed on the theory that she did not get what she bargained for. *Id*. It concluded, "This case turns on a relatively simple question, at least as to damages—Is a car with defective seatbelt buckles worth less than a car with operational seatbelt buckles? Common sense indicates that it is[.]" *Id*. at 991. The similar question here is amenable to classwide resolution. The plaintiffs may show that a vehicle presented with three perfect safety ratings is more valuable than a vehicle presented with no safety ratings. … Thus, because a vehicle with three perfect safety ratings may be able to attract greater market demand than a vehicle with no safety ratings, the misleading sticker arguably was the direct cause of actual damages for the certified class even if members individually value safety ratings differently.

*Carriuolo, supra*, at 986-987; *see Democratic Republic of the Congo v. Air Capital Grp., LLC*, 614 Fed.Appx. 460, 473 (11th Cir. 2015) (measure of

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | damages for defective aircraft is "plane's market value as contracted minus the plane's value as delivered"); *Martin v. Monsanto Co.*, 2017 WL 1115167, *9 (C.D.Cal.) (Because "price is a proxy for value, [the] price paid for a good that was misrepresented to have a given characteristic can serve as a proxy for the value of a product with the misstated characteristic."). | |
| | In the present case, Plaintiff has presented a method for determining damages that is based on AFI's admissions that leather is stronger and more durable than DuraBlend, as reflected in AFI's divergent performance expectations for the two materials, and therefore is attributable to her theory of liability that AFI misled consumers about DuraBlend. Plaintiff's estimate of a 40-percent difference in durability between the two materials based on the 40-percent lower performance standard *that AFI itself* ascribes to DuraBlend is a reasonable inference based on the evidence. Multiplying AFI's aggregate sales to retailers in Florida during the class period by 40 percent, which sales data has been produced in discovery, in turn provides an aggregate measure of classwide damages as the difference between the product as represented and the product actually delivered. *See Carriuolo, supra*, at 986; *see also Monsanto, supra*, at *9 (classwide damages suffered by buyers of weed-killer delivering fewer gallons than promised is capable of measurement on class-wide basis under a benefit-of-the bargain theory by multiplying price by the amount of under-delivered product). | |

| No. | MATTER OBJECTED TO | Page |
|-----|-------------------|------|
| | Measuring and awarding damages in the aggregate has long been accepted in class action litigation as a means of compensating class members, even as individual awards may not be precisely accurate, while protecting the due process rights of defendants: | |

> "Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages …. Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest each member's claim individually, will not withstand analysis …. Just as an adverse decision against the class in the defendant's favor will be binding against the entire class in the aggregate without any rights of indiv-idual class members to litigate the common issues individually, so, too, an aggregate monetary liability award for the class will be binding on the defendant without offending due process." (quoting Newberg on Class Actions).

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, 582 F.3d 156, 197-198 (1st Cir. 2009); *see Hickory Securities Ltd. v. Republic of Argentina*, 493 Fed.Appx. 156, 159 (2nd Cir. 2012) (holding that "[a]ggregate classwide damages are not per se unlawful" so long as "the damages awards roughly reflect the aggre-gate amount owed to class members"); *Hart v. Rick's Cabaret Intern., Inc.*, 2014 WL 7183956, *6 (S.D.N.Y.) ("Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages.");

*In re Polyurethane Foam Antitrust Litigation*, 2015 WL 4459636, *8 (N.D.Ohio) ("The fact that allocation of aggregate damages to individual plaintiffs may be laborious, or less than perfectly accurate, does not fatally undermine predomin-

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | ance or the propriety of class certification. A well-designed claims process can ensure each class member receives damage payments only if and as appropriate."); *see generally* 4 Newberg on Class Actions §§ 12:1, 12:2, 12:15 (5th ed.). | |
| 6. | The Plaintiff claims the damage is now to the point that all three items are unusable (presumably from an aesthetic viewpoint). | 3 |
| | *Objection:* The court here seems to discount Plaintiff's assertion that she has suffered damages from AFI's deception and DuraBlend's lower quality, strength, and durability as compared with leather. Even though Plaintiff is able to sit on the furniture while keeping it covered with blankets, the furniture is, as the court correctly notes, unusable from an aesthetic viewpoint, meaning it no longer looks like leather because it has bubbled and peeled, which in turn is further evidence that DuraBlend is not "of similar quality, strength, and durability as leather" and that Plaintiff and the other members of the class have suffered damages. | |
| 7. | AFI asserts that 70% of the HomeStores report their sales to AFI, however those stores only make up 30% of the total licensee revenue. Doc. 48 (Straus Decl.*),* ex. J (Lebensburger depo.) at 82:13-83-20. And, except for the corporate owned licensees (which make up less than 20% of sales in Florida), AFI does not have unfettered access to licensees' sales information. *Id.* at ex. K (Blemaster depo.) at 38:1-10. Even for the sales it can access, the retrievable data is limited to a customer identification number (not a name, address or phone number) and | 6-7 |

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | "rolled up transactional data" for each customer (as opposed to specific product data). *Id.* at 38:1-10; 85:6-18. And, AFI only keeps data for eighteen to twenty-four months due to data storage issues. Thus, according to AFI, records available are limited:<br><br>• No putative class members that purchased from the primary dealers (making up 40% of AFI's sales) or other non-licensee retailers (making up another 25% of AFI's sales) can be identified;<br><br>• No putative class members that purchased from licensees from December 2011 (the beginning of the class period), through December 2014 (two years before the action was filed), can be identified (representing 54% of AFI's sales to wholesalers); and<br><br>• Only 30% of the customers who purchased after December 2013 (two years before the action was filed) potentially can be identified.<br><br>Doc. 74 at p.12 (citing Straus Decl. ex. J (Lebensburger depo.), ex. K (Blemaster depo.), ex. O (Sales by Wholesaler), ex. P (Hook 30(b)(6) depo.), ex. Q (income statement for DuraBlend®)). | |
| | *Objection:* The court's conclusion that "No putative class members that purchased from licensees from December 2011 (the beginning of the class period), through December 2014 (two years before the action was filed), can be identified" is inaccurate. AFI conceded in its Opposition that it has "unfettered access" to the sales information for its corporate licensees *and* testified separately in deposition that all sales information from the corporate licencees, including the identities of | |

| No. | MATTER OBJECTED TO | Page |
|---|---|---|
| | the purchasing consumers, is available to AFI for the duration of the class period, going back to 2011. (*See* Opposition at 12; Hook Depo II at 54:16-55:20 [identity of class members available to AFI for all corporate licensees for the entire class period going back to 2011]; Hook Depo II at 13:14-25, 39:4-7, 40:24-41:1, and Exh. 2 to Hook Depo II [the sole corporate licensee, Kingswere Furniture LLC, operates 18 of the 41 Ashley HomeStores in Florida].) In other words, ascertain-ability is easily satisfied for a subclass comprising all persons (including Plaintiff) who bought DuraBlend furniture during the class period through one of AFI's corporate stores.<br><br>       Because the district court has an obligation to define the class under Rule 23(c) and, therefore, wide discretion to *redefine* a proposed class, the court's blanket ruling that ascertainability is not satisfied here, despite Plaintiff's propos-ing a subclass (*see* Reply at 18, fn. 16), is improper. *See Chapman v. First Index*, Inc., 796 F.3d 783, 785 (7th Cir. 2015) ("obligation to define the class falls on the judge's shoulders under Fed.R.Civ.P. 23(c)(1)(B)"); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("District courts are permitted to limit or modify class definitions to provide the necessary precision."); *Robidoux v. Celani,* 987 F.2d 931, 937 (2nd Cir.1993) ("court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly"); *Cotromano v. United Technologies Corp.*, 2018 WL 2047468, *10 (S.D.Fla.) ("district court has | |

| No. | MATTER OBJECTED TO | Page |
|---|---|---|
| | discretion to redefine the class to cure a deficiency in the proposed class"); *Herman v. Seaworld Parks & Entertainment, Inc.*, 320 F.R.D. 271, 285 (M.D.Fla. 2017) (district court "has discretion to redefine the class to provide the necessary precision"); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 611 (E.D.La. 2006) ("class definition is a process of 'ongoing refinement and give-and-take,' and, as such, a district court's role is to define a precise class"); *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal.App.4th 908, 916 (2001) ("[I]f necessary to preserve the case as a class action, the court itself can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable."). | |

With respect to the broader class beyond the corporate stores, Plaintiff has proposed a subpoena-based method of identifying the class members that is identical to the method approved by the court in *Karhu v. Vital Pharmaceuticals, Inc.*, 621 F.Appx. 945, 946-947 (11th Cir. 2015):

> Karhu explained that VPX sold Meltdown primarily to third-party retailers, and proposed identifying class members by subpoenaing the retailers for their records. The district court took no issue with the abstract principle that a plaintiff could satisfy the ascertainability requirement by proposing a subpoena-based method for identifying class members. Rather, the district court held only that Karhu should have proposed the method in his class-certification papers, instead of only upon moving to alter or amend. Had Karhu done so, he might well have satisfied the ascertainability requirement before the district court.

*Id.* at 950; *see also Dapeer v. Neutrogena Corporation*, 2015 WL 10521637, *8

| No. | MATTER OBJECTED TO | Page |
|-----|---------------------|------|
| | (S.D.Fla.). | |
| |     In the present case, as she explained in her papers, Plaintiff has obtained from AFI in discovery the names and addresses of all retailers in Florida that sold DuraBlend during the class period. Plaintiff intends to subpoena these retailers and use their records to identify the class members. For the consumers who account for sales made through AFI's corporate stores, which includes Plaintiff's purchase, Plaintiff has requested the sales records in discovery directly from AFI. | |
| 8. | In addition to administrative feasibility problems, determining class membership here will require individual inquiries. | 7 |
| | *Objection:* Inadvertently referencing it as an Eleventh Circuit case, the court cites to *Alhassid v. Bank of America, N.A.*, 307 F.R.D. 684 (S.D.Fla. 2015) for the apparent proposition that Plaintiff must show that the putative class members can be identified on an *automated basis without individualized inquiry*. (R&R at 7, citing *Alhassid* at 695-696.) Surely, this cannot be the standard in the Eleventh Circuit, or anywhere else, as such a rule would swallow the rest of Rule 23; identifying the names of individual class members is an inherently individualized task.<br><br>    The standard for ascertainability in the Eleventh Circuit requires that the class be defined by objective criteria that allow "class members to be identified in an administratively feasible way" through a "manageable process that does not | |

| No. | MATTER OBJECTED TO | Page |
|---|---|---|

require much, if any, individual inquiry." *Karhu v. Vital Pharmaceuticals, Inc.*, 621 F.Appx. 945, 946-947 (11th Cir. 2015). A closer examination of the facts of *Alhassid* reveals why the court found ascertainability lacking:

> [T]he LSAMS system could be used to determine how many times in a given period Nationstar charges a borrower for a given fee. But that would shed no light on whether Nationstar actually inspected the property or appraised the property, etc., more times that (ostensibly) permitted by HUD guidelines. That is, assuming that HUD guidelines prohibit, for example, property inspections in excess of twelve in a one-year period, knowing whether Nationstar charged or assessed a loan account more than twelve property inspection fees in a one-year period would not demonstrate class membership for the borrower on that account. In other words, the LSAMS data as to fee assessment cannot stand in for information as to allegedly improper default-related inspection activity. Based on the evidence before the Court, determining class membership would, therefore, devolve into individually assessing each loan account to determine whether Nationstar conducted impermissibly excessive property inspections, or property preservations efforts, or property appraisals, related to each account.

*Alhassid, supra*, at 695-696.

Because the present case does not involve the myriad complicating factors of the loan servicing system involved in *Alhassid*, the present case is clearly distinguishable. Here, for the all-inclusive class proposed in her papers, Plaintiff has proposed a subpoena-based method of identifying the class members that is identical to the method approved by the court in *Karhu*. Accordingly, the present case involves no individualized inquiry that would be impermissible under *Karhu*.

Moreover, AFI conceded in its Opposition that it has "unfettered access" to the sales information for its corporate licensees *and* testified separately in

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
|  | deposition that all sales information from the corporate licencees, including the identities of the purchasing consumers, is available to AFI for the duration of the class period, going back to 2011. (*See* Opposition at 12; Hook Depo II at 54:16-55:20 [identity of class members available to AFI for all corporate licensees for the entire class period going back to 2011]; Hook Depo II at 13:14-25, 39:4-7, 40:24-41:1, and Exh. 2 to Hook Depo II [the sole corporate licensee, Kingswere Furniture LLC, operates 18 of the 41 Ashley HomeStores in Florida].) In other words, ascertainability is easily satisfied for a subclass comprising all persons (including Plaintiff) who bought DuraBlend furniture during the class period through one of AFI's corporate stores. |  |
| 9. | The proposed class includes putative class members who have no valid FUDTPA or unjust enrichment claims against AFI. | 7 |
|  | *Objection:* The court's finding that ascertainability is lacking because the proposed class "includes putative class members who have no valid FDUTPA or unjust enrichment claims against AFI" is erroneous and a red herring. Damages under FDUTPA are calculated "objectively," based on the product, as opposed to the individual consumer. Under this "benefit of the bargain" model, the factfinder does not look to how much the misrepresentation of the product reduced its value to an individual buyer, but rather to the product itself and the measurable differ- |  |

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | ence between the product as represented and the product actually delivered, resulting in a "standardized" assessment of classwide damages:<br><br>    In *Collins v. DaimlerChrysler Corp.*, 894 So.2d 988, 991 (Fla.Dist.Ct. App. 2004), a Florida appellate court held that a plaintiff adequately alleged actual damages under FDUTPA when she purchased a vehicle with defective seatbelts. Chrysler argued that the plaintiff did not suffer any out-of-pocket damages because the seatbelt never malfunctioned during an accident. *Id*. at 989. The court, however, recognized that this was the wrong metric. *Id*. at 990-91. Because FDUTPA allows for damages based on diminution of market value, the court permitted the plaintiff to proceed on the theory that she did not get what she bargained for. *Id*. It concluded, "***This case turns on a relatively simple question, at least as to damages—Is a car with defective seatbelt buckles worth less than a car with operational seatbelt buckles?*** Common sense indicates that it is[.]" *Id*. at 991. The similar question here is amenable to classwide resolution. The plaintiffs may show that a vehicle presented with three perfect safety ratings is more valuable than a vehicle presented with no safety ratings. … Thus, because a vehicle with three perfect safety ratings may be able to attract greater market demand than a vehicle with no safety ratings, ***the misleading sticker arguably was the direct cause of actual damages for the certified class even if members individually value safety ratings differently***.<br><br>*Carriuolo, supra*, at 986-987, emphasis added. | |
| 10. |   [T]he DuraBlend® at issue in this case involves thousands of pieces and styles of furniture with various hangtags, oral statements by a vast number of salespersons, and the evidence before me fails to demonstrate a systematic or uniform marketing scheme. | 8 |

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | *Objection:* In declining to find analogy in *Fitzpatrick* and *Nelson*, the court fails to focus on the facts relevant to determining whether AFI engages in a systematic or uniform marketing scheme that affects all class members. First, that there may be "thousands of pieces and styles of furniture" throughout AFI's retail network is not relevant where Plaintiff's claim involves only a single distinguishing criterion for the class members' furniture—it must be upholstered in DuraBlend. Second, there are only three versions of the hangtag, and all of them make very similar use of the words "LEATHER" and "DURABLE" on the front, along with imagery suggestive of leather, and identical fine-print "disclosures" on the back. Third, the evidence shows that the "vast number of salespersons" were all subject to AFI's carefully drafted "training" materials distributed throughout its retail network to ensure the DuraBlend furniture would be presented to consumers for maximum effect. For the salespersons of the licensees (including the corporate stores), this included a training manual in which AFI groups in the DuraBlend fabric alongside genuine leather and describes it as a "blended leather material" that has the "look and feel of leather." (*See* Exh. 1 to Hook Decl. [Basic Product Knowledge] at 14.) Presenting DuraBlend in these training materials as one of several "leather classifications," AFI draws no distinction between the DuraBlend fabric and genuine leather when it explains to retailers the benefits of "leather" as | |

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|

"one of the strongest upholstery materials known to man." (*See* Exh. 1 to Hook Decl. [Basic Product Knowledge] at 13, 15, 17.)

Contrary to the court's finding here, the present case is analogous to *Fitzpatrick*. Just like the plaintiff there alleged that the digestive health message permeating defendant's marketing campaign misled the class about Yo-Plus, the present case alleges that AFI's common marketing message, which was centered around leather and its characteristics and to which the class was exposed via hangtags and decking labels, ads and commercials, and the training of sales-persons, was likely to deceive a reasonable consumer.

The present case is also like *Nelson*, as it involves a focused marketing message conveyed to the class in a variety of ways and raises the same pre-dominating common question of whether it would have deceived a consumer acting reasonably under the same circumstances. *See also Martin v. Dahlberg, Inc.*, 156 F.R.D. 207, 211, 217-218 (N.D.Cal. 1994) (misrepresentations of efficacy of hearing aids disseminated via print, TV, radio, and direct mail using varying language raised predominating common questions where the "essential message" conveyed was uniform).

In addition to finding that common issues predominated over indiv-idual issues, the *Nelson* court rejected defendant's argument that plaintiff's claim was not typical of the claims of the class because she did not view all of the alleged representations:

| No. | MATTER OBJECTED TO | Page |
|-----|--------------------|------|
| | Plaintiff need not prove that she relied on any particular representation when she decided to purchase Enfamil® LIPIL®. (Citations omitted.) Because Plaintiff can prove a FDUTPA claim without proving that she relied on a particular representation, Defendant's argument that other members of the class viewed different representations than Plaintiff does not render Plaintiff's claim atypical of the class.<br><br>*Id*. at 696.<br><br>Here, even though some class members viewed AFI's decking label, while others viewed the hangtag or received their representation that Dura-Blend contains leather from a salesperson, *they were all exposed to a uniform sales pitch consisting of viewing a piece of furniture that looked like leather while being told it consisted of leather*. | |
| 11. | AFI notes variations regarding the "durability" of the proposed class members' furniture, dependent on individual factors such as the placement of the furniture (the Plaintiff's is near a window in Florida) and the use of the furniture (the Plaintiff testified she allows her five cats on her furniture and they scratch it). | 11-12 |
| | *Objection:* The durability does not depend on how the furniture is used. The same sofa if sitting in perfect temperature and humidity and is never used will sustain less damage than the same sofa dropped into a pool of acid. The relevant point is that DuraBlend is less durable than leather, and Plaintiff's claim is simply that she and the other members of the class were misled, at the time of purchase, into | |

| No. | MATTER OBJECTED TO | Page |
|---|---|---|
| | believing that DuraBlend (which has the appearance of leather) *contained* leather and therefore "was of similar quality, strength, or durability as leather." | |

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should decline to adopt the R&R, sustain Plaintiff's objections, and grant Plaintiff's Motion for Class Certification.

///

///

///

Dated: July 25, 2018

Respectfully submitted,

By: */s/ Mikael H. Stahle*

Matthew J. Matern (*Pro Hac Vice*)
Mikael H. Stahle (*Pro Hac Vice*)
**MATERN LAW GROUP, PC**
1230 Rosecrans Avenue, Suite 200
Manhattan Beach, California 90266
Telephone: (310) 531-1900
Facsimile: (310) 531-1901
mmatern@maternlawgroup.com
mstahle@maternlawgroup.com

Julie Braman Kane, Fl. Bar No. 980277
Stephanie A. Casey, Fl. Bar No. 97483
**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
julie@colson.com
scasey@colson.com

*Counsel for Plaintiff and Putative Class*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 25th day of July, 2018, I electronically filed a true and correct copy of the foregoing **Objections to Report and Recommendation to Deny Motion for Class Certification** with the Clerk of the Court for the United States District Court for the Middle District of Florida using the CM/ECF system, which will send notification of such filing to all counsel of record (see below Service List).

BY: */s/ Mikael H. Stahle*
Mikael H. Stahle
Admitted *Pro Hac Vice*
mstahle@maternlawgroup.com

<u>**SERVICE LIST**</u>

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA – TAMPA DIVISION**

*Sladjana Perisic v. Ashley Furniture Industries, Inc.*
**Case No. 8:16-cv-03255-EAK-MAP**

Mitchell E. Widom
Fl. Bar No. 473911
Email:  mwidom@bilzn.com
Lori P. Lustrin
Fl. Bar No. 59228
Email:  llustrin@bilzn.com
Bilzin Sumberg Baena Price
& Axelrod, LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Tel:  (305) 374-7580
Fax:  (305) 374-7593
*Counsel for Defendant*

Julie Braman Kane
Fl. Bar No. 980277
Email:  julie@colson.com
Stephanie A. Casey
Fl. Bar No. 97483
Email:  scasey@colson.com
Colson Hicks Eidson, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Tel:  (305) 476-7400
Fax:  (305) 476-7444
*Counsel for Plaintiff and Putative Class*

Mark D. Campbell (*Pro Hac Vice*)
Email:  mcampbell@sidley.com
Rachel A. Straus (*Pro Hac Vice*)
Email:  rstraus@sidley.com
Sidley Austin, LLP
555 West Fifth Street, 40th Floor
Los Angeles, California 90013
Tel:  (213) 896-6000
Fax:  (213) 896-6600
*Counsel for Defendant*

Matthew J. Matern (*Pro Hac Vice*)
Email:  mmatern@maternlawgroup.com
Mikael H. Stahle (*Pro Hac Vice*)
Email:  mstahle@maternlawgroup.com
Matern Law Group, PC
1230 Rosecrans Avenue, Suite 200
Los Angeles, California 90266
Tel:  (310) 531-1900
Fax:  (310) 531-1901
*Counsel for Plaintiff and Putative Class*